

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IVETTE ROSARIO,

           Plaintiff,

-against-

COMMISSIONER OF SOCIAL
SECURITY,

           Defendant.

20-CV-6558 (BCM)

**AMENDED OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Ivette Rosario filed this action pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (Commissioner), following a Continuing Disability Review (CDR), that as of January 13, 2017, plaintiff was no longer disabled and therefore ineligible for Disability Insurance Benefits (DIB) or Supplemental Security Income (SSI). Now before the Court are the parties' cross-motions for judgment on the pleadings. For the reasons that follow, plaintiff's motion (Dkt. No. 23) will be denied, the Commissioner's motion (Dkt. No. 25) will be granted, and the case will be dismissed.

**I.    BACKGROUND**

Plaintiff is a 52-year-old woman with a long history of bipolar disorder that has manifested in five psychiatric hospitalizations for suicidality over a span of 30 years (in 1991, 2008, 2011, 2015, and 2018), typically precipitated by medication non-compliance and abuse of alcohol, marijuana, and/or cocaine. *See* Certified Administrative Record (Dkt. No. 17) (hereinafter "R. __") at 168, 182, 207, 443, 445, 463, 530, 758, 1458. Plaintiff first attempted suicide in 1991, at 21 years old, in response to her mother suffering a stroke, and was hospitalized at Bellevue Hospital Center (Bellevue). (R. 182, 1443.) Thereafter, she was diagnosed with bipolar disorder. (R. 467.) Plaintiff was incarcerated from 1991 to 1996 for robbery. (R. 1050.) Upon release, she held several

jobs from 1996 to 2008, including as a manager at McDonald's from 1996 to 2001, a cashier at Wendy's, a courier, a worker in a book binding factory, and – most recently, from 2005-2008 – a building porter. (R. 1051-54, 1133, 1218, 1497.)

On February 7 and February 27, 2008, plaintiff applied for DIB and SSI, respectively, alleging disability since February 8, 2008, due to bipolar disorder. (R. 1047, 1092, 1095.) On February 19, 2008 – during the pendency of her DIB application, and shortly before filing her SSI application – plaintiff was hospitalized at Bellevue for another suicide attempt. (R. 1458.) She reported that she had been in a depressed mood for one month due to stressors "involving the relationships between her current partner, her ex-partner, and her 16-year-old son." (R. 1459.) She also reported that just before her suicide attempt she had not taken her medications for three days; engaged in "heavy alcohol consumption[]" for three days; used cocaine and marijuana for one day; experienced one day of suicidal ideation; and wanted to "get away from it all" by "jumping off of her roof." (*Id.*)

During her brief (overnight) hospitalization, plaintiff was "restarted on her medications" and kept "free of the influence" of alcohol, cocaine, and marijuana. (R. 1465.) In just one day following her admission, she stated that she had "greatly improved," and the doctors agreed, reporting that she had full, stable, and appropriate affect; was adequately dressed and groomed; was cooperative; made normal eye contact; had normal psychomotor activity and gait; had fluent speech and goal-directed, normal thought content; had no suicidal or homicidal ideation; was alert and oriented "x4"; and had no grossly impaired insight or judgment. (R. 1464.) On February 20, 2008, Bellevue determined that plaintiff "poses no risk to herself or to others" and discharged her. (R. 1465.)

In late February and March 2008, Stephen Goldsmith, M.D., and Anthony Waters, a psychologist-in-training, saw plaintiff for outpatient follow-up. They reported that she was doing well, had no suicidal ideation or signs of psychosis, and that her partner was helping her comply with her medications. (R. 1488, 1495.)

Although plaintiff's February 2008 DIB and SSI applications were initially denied, she requested a hearing before an administrative law judge (ALJ), and on May 30, 2009, appeared *pro se* before ALJ Mark Hecht. (R. 1044.) On July 1, 2009, ALJ Hecht found that plaintiff was disabled within the meaning of the Act and granted her applications. (R. 1095.)

Two years later, on August 19, 2011, plaintiff was hospitalized once again, following a suicide attempt. (R. 443, 445, 450.) With the anniversary of her mother's death looming and distressing her, she stopped taking her medications, consumed alcohol, marijuana, and cocaine, and attempted to jump off the ledge of her apartment building. (R. 445, 450, 455, 463.) During her hospitalization, plaintiff resumed her medications, and, by August 30, 2011, she "consistently denied suicidal ideation"; was adequately dressed and groomed; was cooperative and laughing; had normal psychomotor activity, gait, and eye contact; had goal-directed, logical, and spontaneous thought process and normal thought content; had neither suicidal nor homicidal ideation; had no perceptual disorders; had a euthymic mood, full affect, and intact impulse control; was alert and oriented "x4"; and had no grossly impaired insight or judgment. (R. 470.) On September 2, 2011, plaintiff was discharged. (R. 491.)

Beginning on February 28, 2012, plaintiff received mental health treatment from psychiatrist Mark Rybakov, D.O., at the St. Mark's Place Institute for Mental Health (St. Mark's) (R. 1503), where she was prescribed doxepin (a tricyclic antidepressant), Depakote (a mood stabilizer), and Seroquel (an antipsychotic) to treat her bipolar disorder. (*Id.*) She did well for three

years, until September 3, 2015, when she presented at the clinic "in crisis," displaying "disheveled dress, crying, explosive anger, slurred speech, as well as racing and disorganized though[t] process." (R. 1503.) Plaintiff admitted that she had stopped taking her medications for several days, had used cocaine, and – when her dog ate her dentures – had tried to strangle the dog to death. (R. 549.) She had also been working an "off-the-book" job, from which she was fired just before her decompensation. (R. 550, 552.) Due to her symptoms, plaintiff agreed to be admitted to Bellevue. (R. 1503.) She remained hospitalized for two weeks, until September 17, 2015, during which time she resumed her medications and thereafter presented normally, with adequate hygiene and grooming; cooperative behavior and normal eye contact; normal psychomotor activity and gait; normal speech; goal-directed, logical, and spontaneous thought process and normal thought content; neither suicidal nor homicidal ideation; no perceptual disorders; euthymic mood; stable and appropriate affect; intact impulse control; alertness and orientation "x4"; and fair insight and judgment. (R. 754, 761.) This was her last psychiatric hospitalization prior to the CDR that the Social Security Administration (SSA) undertook in January 2016.

Beginning in 2015, plaintiff also sought medical treatment for back, joint, and knee pain. On August 17, 2015, she went to the Roberto Clemente Center at Gouverneur Diagnostic and Treatment Center (Gouverneur), where she received physical therapy for back pain. (R. 1506-07.) She gave her current occupation as "construction worker" and was given exercises to perform at home. (*Id.*) Imaging of her lumbar spine the following day showed that there was "no significant spondylolisthesis or instability," but that there was "mild multilevel spondylosis" and "moderate lower lumbar facet arthrosis." (R. 1512.) On January 21, 2016, plaintiff went back to Gouverneur for an ultrasound of her left knee. The visualized vascular structures and soft tissues were within normal limits; a prior finding of Baker's cyst was no longer noted; and the Gouverneur staff

concluded that the ultrasound was "[u]nremarkable." (R. 1526.) On July 26, 2016, plaintiff's elbows were imaged at Gouverneur. There was no acute fracture; her joint spaces and alignment were preserved; and there was no joint effusion. (R. 1527.)

### A.   The CDR

On January 20, 2016, the SSA initiated a CDR to determine whether plaintiff was still entitled to the benefits she had been receiving since July 2009. (R. 1263.) In a continuing disability report, plaintiff stated that on a typical day she takes her grandson to school ("every morning"), comes home, has coffee, cleans her house, walks her dog, watches TV, and takes her medication. (R. 1284.) Her other activities of daily living (ADLs) included fishing ("when its nice out"), working out ("twice a day 3 times a week"), and "[s]pend[ing] time with my grandson on weekends." (*Id.*) She had no difficulties with grooming or most household chores, but did not prepare meals because she is afraid of fire, did not use public transportation because she does not "like to be closed in," and did not shop because she "can't be around too many people." (*Id.*) Plaintiff reported difficulty with concentrating ("mind moves too fast for me"), remembering, understanding or following directions ("get confused fast"), and completing tasks ("I start things and can't finish them"), but no difficulty in managing money or getting along with people. (*Id.*)

On October 13, 2016, Tammy Inman-Dundon, Ph.D., completed a "Psychiatric Review Technique" (PRT) form concerning plaintiff. (R. 1564.) After reviewing plaintiff's records, Dr. Inman-Dundon concluded that she had bipolar disorder, which was medically determinable, but did not "precisely satisfy the diagnostic criteria" of Listing 12.04 (depressive, bipolar and related disorders), 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. (R. 1567.) Dr. Inman-Dundon then found that plaintiff had "mild" restrictions in her ADLs; no difficulty maintaining social functioning; and "mild" difficulties maintaining concentration, persistence, or pace. (R. 1574.) Finally, Dr. Inman-Dundon stated that there was "insufficient evidence" of repeated episodes of

deterioration, "each of an extended duration." (R. 1574, 1580.)[1] She also found that, by September 10, 2016, plaintiff was "doing well" – specifically, that she was alert and oriented "x3"; had neither suicidal nor homicidal ideation; had no overt psychosis; had a euthymic mood and linear thought process; and was working "in maintenance." (R. 1580.) Dr. Inman-Dundon's final assessment was that "there has been significant improvement in [plaintiff's] condition, [and] therefore disability is ceased." (*Id.*)

On October 22, 2016, Dr. Rybakov and Molly Heim, L.M.S.W., submitted a joint letter to the Division of Disability Determinations. (R. 1586-87.) They summarized plaintiff's treatment history at St. Mark's since February 2012, including weekly individual psychotherapy sessions and monthly medication management with doxepin, Depakote, and Seroquel. (*Id.*) Dr. Rybakov and Ms. Heim reported that plaintiff was "currently compliant with all aspects of treatment"; had a normal appearance, build/stature, and posture; used a normal tone, volume and speed in speech; made average eye contact; had normal motor activity; was cooperative, with full affect and an irritable but euthymic mood; suffered neither hallucinations nor delusions; "denies current suicidal and homicidal ideations"; had logical thought processes and normal perception; was oriented to person, place, and time; possessed average intelligence; and had normal insight and judgment. (*Id.*)

On November 14, 2016, Ram Ravi, M.D., performed a consultative internal medicine examination of plaintiff on referral from the Division of Disability Determination. (R. 1588.) During the exam, plaintiff complained of poor vision bilaterally, neck pain (self-rated as eight out

---

[1] As of October 13, 2016, the governing regulations required the Commissioner to evaluate and rate the degree of functional limitation resulting from a claimant's mental impairments in four broad functional areas: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3) (effective June 13, 2011 to January 16, 2016). Each area was rated on a five-point scale: "None, mild, moderate, marked, and extreme." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4) (effective June 13, 2011 to January 16, 2016).

of ten for the past five years), diabetes, and diabetic neuropathy causing "numbness" and "tingling" in plaintiff's extremities. (R. 1589.) She denied either suicidal or homicidal ideation, and described her ADLs as bathing, dressing, and watching television daily. (R. 1590.) Dr. Ravi observed that plaintiff was alert and oriented "x3"; appeared to be in no acute distress; had a normal gait; walked without difficulty; could perform a full squat; had a normal stance; used no assistive devices; had no issues sitting; had full flexion, extension, and lateral flexion bilaterally, and full rotary movement bilaterally of her cervical spine; had full flexion, extension, lateral flexion, and rotary movement bilaterally of her lumbar spine; had no issues with her shoulders, wrists, or knees; had stable joints with no redness, heat, swelling, or effusion; and had "5/5" (full) strength in all extremities. (R. 1591.) Dr. Ravi concluded that plaintiff had no limitations to sitting, standing, bending, pushing, pulling, lifting, and carrying, but should be limited from engaging in activities requiring fine visual acuity (due to her myopia), and should not drive (due to her diabetic neuropathy). (R. 1592.)

The file also contains Dr. Rybakov's treatment notes, which – with one notable exception, discussed below – generally reflect that plaintiff displayed stable mental health from 2016 forward. On May 9, 2016, there were "no issues to [report]," as she was "stable on[]meds," which she took as prescribed. (R. 1531-32.) Plaintiff was alert and oriented "x3" with no suicidal or homicidal ideation, no overt psychosis, and a linear thought process. (R. 1542-44.) Her appearance and behavior were "unremarkable" and her mental status exam revealed a euthymic and irritable mood, full affect, clear speech, normal perception and thought content, no delusions, average intelligence, normal cognition, insight, and judgment, and no risk factors. (*Id.*) On June 28, 2016, the results were virtually the same, although it was noted she appeared to be under the influence of marijuana, with decreased appetite. (R. 1545-46.) Further unremarkable results followed on August 9, 2016

7

and September 19, 2016. (R. 1551, 1557-58.) During the August 9 session, Dr. Rybakov noted that plaintiff "is trying to adhere to a better diet" and "contin[ue]s to work." (R. 1551.)

On January 13, 2017, the SSA determined that plaintiff's medical condition had improved to the point where she could secure substantial gainful employment, and thus that she was no longer eligible for benefits. (R. 23, 1102.) On February 23, 2017, plaintiff filed a written request for reconsideration of that decision. (R. 1117.) That same day, Dr. Rybakov and Ms. Heim submitted another letter to the SSA, virtually identical to their letter of October 22, 2016, but now including the following opinion: "given Ms. Rosario's mental health history as well as psychiatric hospitalizations, we do not believe Ms. Rosario is capable of sustaining consistent part-time work and recommend Ms. Rosario continue to receive disability benefits." (R. 1598-99.) Dr. Rybakov and Ms. Heim submitted an identical letter on June 7, 2017. (R. 1618-19.)

On March 6, 2017, E. Kamin, Ph.D., completed a PRT form concerning plaintiff. (R. 1601.) Like Dr. Inman-Dundon, Dr. Kamin concluded that she had bipolar disorder, which was medically determinable, but did not "precisely satisfy the diagnostic criteria" of Listing 12.04. (R. 1605.) Dr. Kamin then found that plaintiff had "mild" limitations in understanding, remembering, or applying information, and interacting with others, and "moderate" limitations in concentrating, persisting, or maintaining pace and adapting or managing oneself. (R. 1614.)[2]

On August 24, 2017, plaintiff attended a hearing before a Disability Hearing Officer (DHO) (R. 1118-26), and on October 2, 2017, the DHO affirmed the decision to cease plaintiff's

---

[2] As of March 6, 2017, the governing regulations still required the Commissioner to evaluate and rate the degree of functional limitation resulting from a claimant's mental impairments in four broad functional areas, but the description of those functional areas had been updated: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3) (effective January 17, 2017). The rating scale was unchanged.

benefits. (R. 1127-39.) During the hearing, plaintiff testified that she "experiences uncontrolled emotions," "stresses the little things," and "[c]ries all the time." (R. 1130.) She also testified that she "spends a lot of time with her grandson who lifts her spirits"; takes her grandson to school every morning; spends time with her grandson on weekends; exercises twice a week; watches television; goes fishing in good weather; plays video games; walks her dogs three times a day; and walks to appointments as needed. (R. 1130-32.) The medical evidence in plaintiff's file, subsequent to her 2015 hospitalization, indicated that she was "compliant and doing well. No psychotic symptoms, no racing thoughts or disorganization of thoughts. Claimant is reported as euthymic, mood stable, no manic symptoms reported." (R. 1132.) The DHO concluded that:

> Based on the psychiatric findings, the claimant retains the capacity to follow one- and two-step instructions. She also retains the capacity to maintain concentration levels to function and perform basic work skills in at least an unskilled work setting that does not require complex instructions and tasks. The claimant has the skills to cooperate with supervisors and co-workers. She is capable of engag[ing] in at least unskilled work activity at a level consistent with substantial gainful work activity.

(R. 1133.)

On October 16, 2017, plaintiff requested a hearing before an ALJ. (R. 1141.) While awaiting her hearing, she continued to see Dr. Rybakov, whose treatment notes further corroborated her ongoing stable mental health, as observed on November 14, 2017 (R. 1630), February 19, 2018 (R. 1635-36), and April 23, 2018. (R. 1641-42.) However, in mid-May 2018, plaintiff stopped taking her medications and abused alcohol, marijuana, and cocaine in response to resurgent distress over the deaths of her mother and sister years prior. (R. 168-82.) This behavior precipitated another suicide attempt – this time, by overdosing on Seroquel – and on May 14, 2018, plaintiff voluntarily admitted herself to Bellevue. (*Id.*) She was there for four days, during which time she was restored on her medications, rapidly improved, and was discharged. (*Id.*) Thereafter,

Dr. Rybakov observed during three psychiatric appointments over the course of a year – on June 21, 2018 (R. 1653-54), August 21, 2018 (R. 1659-60), and June 17, 2019 (R. 426, 431) – that plaintiff was compliant with her medications and stable.

On May 1, 2019, plaintiff appeared *pro se* before ALJ Mark Solomon. (R. 23, 1062.) Asked about her mental impairments, plaintiff testified that she "can be happy one minute, and the next minute I can be depressed," even when "taking my medications." (R. 1077.) Raymond E. Cestar, appearing as an impartial vocational expert (VE), also testified. (R. 1062.) VE Cestar opined that an individual with the same age, education, and work experience as plaintiff, and with her residual functional capacity (RFC) as determined by the ALJ (discussed below) could perform certain jobs at the light exertional level, including photo copying machine operator (DOT 207.685-014; SVP 2), office helper (DOT 239.569-010; SVP 2), and produce weigher (DOT 299.587-010; SVP 2). (R. 1080-81.)

### B.    The ALJ's Decision

On May 29, 2019, the ALJ issued an unfavorable decision (Decision) (R. 23-32), concluding that plaintiff's disability ended on January 13, 2017. (R. 32.) In making this determination, the ALJ followed the eight-step evaluation process for a Title II (DIB) claim undergoing CDR and the seven-step evaluation process for a Title XVI (SSI) claim undergoing CDR. *See* 20 C.F.R. §§ 404.1594, 416.994; *Godwin v. Barnhart*, 2005 WL 1683538, at *8-10 (S.D.N.Y. July 18, 2005) (eight-step process for CDR of DIB claims); *Baker v. Comm'r of Soc. Sec.*, 2014 WL 1280306, at *4-5, 5 n.1 (N.D.N.Y. Mar. 27, 2014) (eight-step process for CDR of DIB claims and seven-step process for CDR of SSI claims).[3]

---

[3] In their motion papers, both plaintiff and the Commissioner incorrectly rely on and apply the familiar five-step evaluation process used for an initial determination of disability in adult DIB and SSI claims. *See* Pl. Mem. (Dkt. No. 23) at 14-15; Def. Opp. (Dkt. No. 26) at 9-10.

At step one for the DIB claim, *see* 20 C.F.R. § 404.1594(f)(1), the ALJ found that plaintiff had not engaged in substantial gainful activity through the date of the Decision. (R. 25.)

At step two for the DIB claim and step one for the SSI claim, *see* 20 C.F.R. §§ 404.1520(d), 404.1425, 404.1526, 404.1594(f)(2), 416.920(d), 416.925, 416.926, 416.994(b)(5)(i), the ALJ found that since January 13, 2017, plaintiff had the medically determinable impairments of bipolar disorder, lumbar degenerative disc disease, left knee Baker's cyst, and bilateral myopia. (R. 25.) He also found that none of these impairments, individually or in combination, met or equaled the Listings codified at 20 C.F.R. pt. 404, subpt. P, app. 1. (R. 25-26.) With respect to the "paragraph B criteria" applicable to Listing 12.04, the ALJ found that plaintiff had: (1) "mild" limitations in understanding, remembering, or applying information (with no limits in memory, cognition, or alertness, but limited by her ninth grade education); (2) "moderate" limitations in interacting with others (which is why he limited her to "low contact work"); (3) "moderate" limitations in concentrating, persisting, or maintaining pace (which is why he limited her to "low production jobs"); and (4) "mild" limitations in adapting or managing oneself. (R. 25-26.)[4]

At step three for the DIB claim and step two for the SSI claim, *see* 20 C.F.R. §§ 404.1594(f)(3), 416.994(b)(5)(ii), the ALJ found that medical improvement had occurred by

---

[4] The "paragraph B" criteria are satisfied if the claimant has an "[e]xtreme limitation of one, or marked limitation of two" of the same four broad areas of mental functioning used throughout the PRT. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04B. Alternatively, a claimant may satisfy the "paragraph C" criteria if she has "a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: (1) Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder; *and* (2) Marginal adjustment, that is, [the claimant has] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04C (emphasis in original). ALJ Solomon found that plaintiff did not satisfy the "paragraph C" criteria because the record did not establish "marginal adjustment," that is, "a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." (R. 26.)

January 13, 2017, in that the severity of plaintiff's bipolar disorder had decreased since July 1 2009, which was the date of the "comparison point decision" (CPD). (R. 26-27.) The ALJ explained that by January 13, 2017, notwithstanding plaintiff's diagnoses of "bipolar disorder, lumbar degenerative disc disease, left foot [sic] Baker's cyst, and bilateral myopia," her "conditions [did] not cause more than moderate deficiencies in interacting with others and with regard to concentration, persistence, or pace." (R. 27.)

At step four for the DIB claim and step three for the SSI claim, *see* 20 C.F.R. §§ 404.1594(c)(3)(ii), 416.994(b)(2)(iv)(B), the ALJ found that plaintiff's medical improvement was related to her ability to work, because it resulted in an increase in her RFC compared to her RFC at the time of the CPD. (R. 27.)

Because plaintiff had experienced medical improvement, the ALJ proceeded to step six for the DIB claim and step five for the SSI claim, *see* 20 C.F.R. §§ 404.1954(f)(6), 416.994(b)(5)(v), and found that plaintiff's current impairments (since January 13, 2017) were severe in combination, in that they "cause more than minimal limitation in the claimant's ability to perform basic work activities." (R. 27.)

At step seven for the DIB claim and step six for the SSI claim, *see* 20 C.F.R. §§ 404.1594(f)(7), 416.994(b)(5)(vi), the ALJ determined that plaintiff had the RFC to perform light work, as defined in 20 CFR §§ 404.1567(b) and 416.967(b), except that:

> . . . she is unable to work with very small objects such as bolts, nuts and screws; however, she can perform a full range of unskilled repetitive, rote work with no other limits other than she would require a job with only occasional close interpersonal contact with supervisors and coworkers, no close interpersonal contact with [the] general public, and can perform a job not requiring assembly line production quotas.

(R. 27-28.)[5] In making this determination, the ALJ considered the entire record and found that while plaintiff's medically determinable impairments could reasonably be expected to produce their alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent" with the objective medical and other evidence before him. (R. 28.)

In support of that finding, the ALJ reviewed the extensive progress notes by Dr. Rybakov at St. Mark's, which documented plaintiff's consistently normal mental status exams and generally stable mental health from 2016 through the date of the hearing, as well as the single episode of decompensation that resulted in her four-day hospitalization in May 2018. (R. 28-30.) He also reviewed the medical opinion evidence, assigning "substantial" weight to the March 6, 2017 evaluation by Dr. Kamin. (R. 29.) The ALJ acknowledged that Dr. Kamin was not an examining or treating source but found that "his opinion accurately reflects the claimant's functioning based upon treatment notes at the time." (R. 29.) The ALJ added that Dr. Kamin's opinion was consistent with the St. Mark's treatment notes, which showed that plaintiff "continues to be asymptomatic and stable." (R. 29.) The ALJ noted, however, that based on plaintiff's testimony concerning her difficulties with stress, he "limited her to low contact, low production work." (*Id.*) Turning to Dr. Rybakov's February 23, 2017 letter – in which he opined that plaintiff could not sustain consistent work, even part-time – the ALJ determined that it was "not entitled to controlling weight" because

_____

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

it was inconsistent with other evidence in the record, including Dr. Rybakov's own treatment records, as well as his prior letter, dated October 22, 2016, both of which "showed the claimant to be functioning fully normally when she is compliant with her medications." (R. 30.) The ALJ concluded that "the claimant's condition is well controlled on medications." (*Id.*)

At step seven for the DIB claim and step six for the SSI claim, *see* 20 C.F.R. §§ 404.1565, 416.965, the ALJ found that plaintiff had no past relevant work for him to consider from her nine-year period of disability. (R. 30.)

At the final step for both claims, *see* 20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), 416.966, the ALJ determined that since January 13, 2017, plaintiff has been able to perform jobs that exist in significant numbers in the national economy. (R. 30.) In reaching this conclusion, he relied on VE Cestar's testimony that plaintiff could work as a photocopy machine operator, office helper, or produce weigher. (R. 31.) The ALJ concluded that plaintiff was "not disabled." (*Id.*)

## C.    Proceedings Before the Appeals Council

On June 6, 2019, plaintiff requested that the Appeals Council review the Decision. (R. 1173-74.) Thereafter, through counsel, she submitted additional evidence. (R. 1341-42.) The additional evidence included, *inter alia*, plaintiff's treating notes from Bellevue (which the Court has incorporated into its discussion of the relevant facts) and a "Diagnosis of Mental Disorders" form (Diagnosis Form) that Dr. Rybakov filled out on November 22, 2019. (R. 421-22.) On the Diagnosis Form, Dr. Rybakov checked boxes to opine that plaintiff had: (1) "moderate" limitations in understanding, remembering, or applying information; (2) "marked" limitations in interacting with others; (3) "marked" limitations in concentrating, persisting, or maintaining pace; and (4) "marked" limitations in adapting or managing oneself. (*Id.*) He added that plaintiff "relies on weekly individual psychotherapy and medication" to diminish the symptoms/signs of her mental disorder, and has a "history of psychiatric hospitalizations + rapid decompensation due to

14

noncompliance with medications." (R. 422.) Dr. Rybakov attached his treating notes from plaintiff's November 1, 2019 appointment, which reported that she had "[n]o issues," was "not working at the moment," and was "getting along with people," with a "stable" mood, no mania, and "no drug use." (R. 423.)

On July 16, 2020, the Appeals Council denied plaintiff's request for review of the Decision (R. 1), rendering the ALJ's determination final. In its denial, the Appeals Council explained that the newly-submitted evidence "does not show a reasonable probability that it would change the outcome of the decision" (R. 2), and did not exhibit the evidence. *See* 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5) (the Appeals Council will receive additional evidence if it is "new, material, and relates to the period on or before the date of the hearing decision, and [if] there is a reasonable probability that the additional evidence would change the outcome of the decision").[6]

This action followed.

## II.   THE PARTIES' POSITIONS

In this Court, plaintiff asserts three principal arguments, all relating to plaintiff's mental impairments. *First*, she contends that the ALJ violated the treating physician rule, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), by not affording proper weight to the opinions of Dr. Rybakov. *See* Pl. Mem. at 15-17. According to plaintiff, Dr. Rybakov "found," in his November 22, 2019

---

[6] Plaintiff does not challenge the decision of the Appeals Council with respect to the newly-submitted evidence. Under the law of this Circuit, however, "new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996); *accord Rutkowski v. Astrue*, 368 F. App'x 226, 229-30 (2d Cir. 2010); *Wharton v. Berryhill*, 2018 WL 5619961, at *6-7 (S.D.N.Y. Aug. 14, 2018), *report and recommendation adopted,* 2019 WL 1410745 (S.D.N.Y. Mar. 28, 2019). Consequently, even though the ALJ did not have the opportunity to review the evidence submitted for the first time after the date of the Decision, I have carefully considered it in connection with plaintiff's challenges to the Commissioner's determination.

Diagnosis Form (R. 419-22), that "she meets the listings for 12.04 bipolar disorder." *Id.* at 16. Plaintiff also relies on Dr. Rybakov's February 23, 2017 letter (R. 1598-99), in which he opined that she was not "capable of sustaining consistent part-time work," and argues that the ALJ erred "by providing little weight to Ms. Rosario's treating sources," Pl. Mem. at 17; *see also* Pl. Reply Mem. (Dkt. No. 27) at 5 (arguing that the ALJ failed to give "good reasons" for affording less than controlling weight to Dr. Rybakov's opinions).

*Second*, plaintiff argues that the ALJ failed to attribute "proper weight" to plaintiff's subjective complaints and, in particular, that he violated SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017), by discounting her testimony on the basis of her intermittent treatment non-compliance without considering the "possible reasons" for that non-compliance. *See* Pl. Mem. at 17-18; Pl. Reply Mem. at 7-8.

*Third*, and most broadly, plaintiff asserts that the ALJ "failed adequately to consider Ms. Rosario's non-exertional impairments and their effects on her ability to work," Pl. Mem. at 18, and as a result formulated an "inaccurate RFC" and posed an incomplete hypothetical to the VE. *Id.* According to plaintiff, the ALJ "mischaracterized the evidence, selectively quoted the record, and misapplied the relevant legal standard," warranting remand for a new hearing or for calculation of benefits. *Id.* at 20.

The Commissioner argues that substantial evidence supported the ALJ's finding that plaintiff's bipolar disorder did not meet or equal Listing 12.04, *see* Def. Opp. (Dkt. No. 26) at 11-14, as well as his credibility findings and his determination of plaintiff's RFC, *id.* at 14-22, and that he properly weighed the opinion evidence in the record. *Id.* at 22-24. Although I do not accept every point argued by the Commissioner, I agree that the Decision is free from legal error and that

the ALJ's factual findings, including his determination as to Listing 12.04 and his formulation of plaintiff's RFC, are supported by substantial evidence in the record.

## III.   STANDARDS

In considering the parties' motions, I have reviewed the entire administrative record (totaling 1,664 pages, including the post-Decision evidence submitted to the Appeals Council) and applied the familiar and frequently reiterated standards used by federal district courts to review decisions of the Commissioner. Generally speaking, a court may set aside an ALJ's decision only if it is based upon legal error or if the ALJ's factual findings are not supported by substantial evidence. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at \*8 (S.D.N.Y. Apr. 29, 2008); *Conyers v. Comm'r of Soc. Sec.,* 2019 WL 1122952, at \*11-13 (S.D.N.Y. Mar. 12, 2019).

This standard applies to Continuing Disability Reviews just as it does to initial applications for benefits. *See, e.g.*, *McColl v. Saul*, 2019 WL 4727449, at \*6 (E.D.N.Y. Sept. 27, 2019); *Deronde v. Astrue*, 2013 WL 869489, at \*7 (N.D.N.Y. Feb. 11, 2013), *report and recommendation adopted*, 2013 WL 868076 (N.D.N.Y. Mar. 7, 2013). Although "[t]he burden of proof to establish that a plaintiff has experienced a medical improvement supporting a termination of benefits lies with the Commissioner," *McColl v. Saul*, 2019 WL 4727449, at \*15 & n.13 (E.D.N.Y. Sept. 27, 2019) (collecting cases), "a claimant's benefits may be terminated so long as 'there is substantial evidence demonstrating a "medical improvement" which enables the individual to engage in substantial gainful activity.'" *Susan A. v. Saul*, 2019 WL 6310730, at \*2 (N.D.N.Y. Nov. 25, 2019) (quoting *Baker v. Comm'r of Soc. Sec.*, 2014 WL 1280306, at \*4 (N.D.N.Y. Mar. 27, 2014)).

### A.   Treating Physician Rule

Where, as here, the claim for benefits was initiated prior to March 27, 2017, the court must ensure that the ALJ complied with the treating physician rule, which required him to give

controlling weight to the opinion of plaintiff's treating physicians so long as those opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)." Put another way: "The ALJ can discount a treating physician's opinion only if the ALJ believes that it 'lack[s] support or [is] internally inconsistent.'" *Ramos v. Comm'r of Soc. Sec.*, 2015 WL 708546, at *15 (S.D.N.Y. Feb. 4, 2015) (quoting *Duncan v. Astrue*, 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011)).

If the ALJ assigns less than controlling weight to the opinion of a treating physician, he must give "good reasons" for doing so, which he must "comprehensively set forth." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)). In particular, the ALJ must "explicitly consider . . . (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013); *see also* 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), 416.927(c)(2)(i)-(ii). "[F]ailure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand," *Greek*, 802 F.3d at 375; *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (per curiam), unless a "searching review of the record" assures the Court that "the substance of the treating physician rule was not traversed." *Estrella*, 925 F.3d at 95-96 (quoting *Halloran*, 362 F.3d at 33).

### B.    Subjective Reports of Symptoms

In formulating a claimant's RFC, the ALJ is required to "consider" her reports of pain and other symptoms, 20 C.F.R. §§ 404.1529(a), 416.929(a), but "is not required to accept the claimant's subjective complaints without question." *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 736 (S.D.N.Y. 2018) (citing *McLaughlin v. Sec'y of Health. Educ. & Welfare*, 612 F.3d 701, 704-05

18

(2d Cir. 1980)). The SSA's regulations provide a two-step process for evaluating the claimant's statements regarding her pain or other limiting symptoms:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability. If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted). At the second step, when considering the "intensity and persistence" of the claimant's symptoms, the ALJ must consider "all of the available evidence," both medical and non-medical, 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 16-3p, 2017 WL 5180304, at *5-8, including the claimant's "attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed." SSR 16-3p, 2017 WL 5180304, at *9.

As with any other finding of fact, "[a]n ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court." *Rivera v. Berryhill*, 2018 WL 4328203, at *10 (S.D.N.Y. Sept. 11, 2018) (citing *Osorio v. Barnhart*, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006)). Thus, a district court will not "second-guess" the ALJ's credibility finding "where the ALJ identified specific record-based reasons for his ruling," *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010) (summary order), and where the finding is supported by substantial evidence. *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013).

### C.    Residual Functional Capacity

A claimant's RFC is the "most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). A claimant's RFC is based on all of the relevant medical and other evidence in the record, including her credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 404.1545(a)(3),

416.945(a)(3). Although necessarily informed by the medical evidence in the record, "[a]n RFC finding is administrative in nature, not medical, and its determination is within the province of the ALJ[.]" *Curry v. Comm'r of Soc. Sec.*, 855 Fed. App'x 46, 48 n.3 (2d Cir. 2021). In determining the claimant's RFC, the ALJ is not required to accept, or follow, any one medical opinion. *See Camille v. Colvin*, 652 Fed. App'x 25, 29 n.5 (2d Cir. 2016) (summary order) ("An ALJ may accept parts of a doctor's opinion and reject others.").

### D.    Substantial Evidence

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi*, 2009 WL 50140, at *21 (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) and *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; the court may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than one interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks omitted). Thus, the substantial evidence standard is "a very deferential standard of review." *Id.*

## IV.     DISCUSSION

### A.     The ALJ Did Not Violate the Treating Physician Rule

Plaintiff contends that the ALJ erred in failing to give controlling weight to two opinions of her treating physician, Dr. Rybakov: his November 22, 2019 Diagnosis Form (R. 419-22), in which, according to plaintiff, her physician "found that she meets the listings for 12.04 bipolar disorders," Pl. Mem. at 16; and his February 23, 2017 letter (R. 1598-99), in which he wrote that he did "not believe that Ms. Rosario is capable of sustaining consistent part-time work." I discern no error.

The ALJ could not have erred in his weighing of the Diagnosis Form, because it had not yet been written when the Decision was issued, and consequently was not before the ALJ to be weighed.[7] Moreover, whether a claimant meets a Listing is a determination "reserved for the Commissioner." *Torres v. Colvin*, 2014 WL 4467805, at *7 (S.D.N.Y. Sept. 8, 2014); *see also Hendricks v. Comm'r of Soc. Sec.*, 452 F. Supp. 2d 194, 199 (W.D.N.Y. 2006) ("Whether plaintiff has an impairment or combination of impairments that meets or equals a Listing is a determination reserved for the Commissioner. Treating physician opinions regarding the criteria for a Listing are not entitled to controlling weight."); *Guzman v. Astrue*, 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) ("medical opinions regarding whether the claimant's 'impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1' . . . are not

---

[7] Because the Diagnosis Form is now part of the administrative record, *see Chater*, 77 F.3d at 45, the Court reviews it (along with the other documents submitted to the Appeals Council) "to determine whether the agency decision is supported by substantial evidence," *Citro v. Colvin*, 2018 WL 1582443, at *4 n. 12 (S.D.N.Y. Mar. 28, 2018), but not to determine whether the ALJ committed legal error. *See, e.g.*, *Lesterhuis v. Colvin*, 805 F.3d 83, 88 (2d Cir. 2015) (per curiam) (holding that the ALJ's decision was "not supported by substantial evidence, particularly in light of treating physician Dr. Holder's medical opinion, which was added the record by the Appeals Council" and which "contradicted the ALJ's conclusion in important respects").

controlling"); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments . . . the final responsibility for deciding [this issue] is reserved to the Commissioner."). To the extent, therefore, that Dr. Rybakov offered an opinion as to whether plaintiff met Listing 12.04, that opinion would not qualify for the treating physician rule.

By the same token, a medical opinion that a claimant is not "capable of" work invades the province of the Commissioner and is not entitled to controlling weight. *See Killings v. Comm'r of Soc. Sec.*, 2016 WL 4989943, at *13 (S.D.N.Y. Sept. 16, 2016) ("Dr. Dokko's statement that the plaintiff's conditions 'make it impossible for her to work'" is "an opinion on an issue reserved to the Commissioner," such that "the ALJ was not required to give it special weight"), *report and recommendation adopted sub nom. Killing v. Comm'r of Soc. Sec.*, 2016 WL 6952342 (S.D.N.Y. Nov. 28, 2016); *Guzman*, 2011 WL 666194, at *10 ("a treating physician's opinion that the claimant is 'disabled' or 'unable to work' is not controlling"); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Consequently, although Dr. Rybakov's February 23, 2017 opinion was before the ALJ, requiring him to "consider" it, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), he was not required to afford it any deference under the treating physician rule.

In considering the February 23, 2017 letter, the ALJ acknowledged that it was written by plaintiff's "long time treating doctor" but permissibly gave it "little weight." (R. 30.) As explained in the Decision, Dr. Rybakov's conclusion lacked support in the record. (*Id.*) The letter itself merely listed plaintiff's diagnoses, medications, and hospitalizations (ending with her 2015 admission); it

provided no functional analysis, and no insight into the key question for the Commissioner, which was whether her impairments – which were admittedly severe enough to render her disabled in 2008 – had improved to the point of non-disability. Further, as the ALJ noted, the February 23, 2017 letter was inconsistent with Dr. Rybakov's extensive treatment records, "which showed the claimant to be functioning fully normally when she is compliant with her medications." (R. 30.)[8] Thus, he also did not err in affording Dr. Rybakov's February 23, 2017 letter little weight.

### B.   The ALJ Did Not Err in Evaluating Plaintiff's Symptoms

Plaintiff next argues that the ALJ "failed to consider any reasons listed under SSR 16-3p" for plaintiff's intermittent noncompliance with her medication regimen. Pl. Mem. at 17. The relevant portion of SSR 16-3p permits an ALJ to consider a claimant's efforts to seek treatment, "and to follow treatment once it is prescribed," when evaluating the intensity and persistence of her alleged symptoms. SSR 16-3p, 2017 WL 5180304, at *9.[9] As the ruling recognizes, a claimant's failure to seek treatment, or adhere to treatment once prescribed, may suggest that her symptoms are less debilitating than she alleges them to be. *See, e.g.*, *James D. v. Comm'r of Soc. Sec.*, 547 F. Supp. 3d 279, 289-90 (W.D.N.Y. 2021) (ALJ properly relied on plaintiff's persistent refusal of "any long-term treatment for his MS," together with evidence that his "flare-ups" were

---

[8] The February 23, 2017 letter was also inconsistent with the letter that Dr. Rybakov wrote four months earlier, on October 22, 2016. (R. 1587.) That letter reported that plaintiff's "mental status" was wholly unremarkable: her appearance, posture, speech, eye contact, motor activity, attitude, affect, and mood were all normal; there was no evidence of hallucinations or delusions; her thought process was logical; her perception was within normal limits; her intelligence appeared to be average; and "both insight and judgment were within normal limits." (*Id.*)

[9] "Social Security Rulings 'are binding on all components of the Social Security Administration' and 'represent precedent final opinions and orders and statements of policy and interpretations' adopted by the Social Security Administration." *Clark v. Berryhill*, 697 Fed. App'x 49, 50 (2d Cir. 2017) (summary order) (quoting 20 C.F.R. § 402.35(b)(1)).

infrequent and his examinations mostly normal, to find his allegations of "ongoing pain and deterioration" "not fully credible").

However, before "weighing the claimant's noncompliance against his [or her] claim for benefits," *White v. Berryhill*, 2018 WL 2926284, at *6 (D. Conn. June 11, 2018), the ALJ must "consider[] possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints," SSR 16-3p, 2017 WL 5180304, at *9, such as intolerable side effects from prescribed medication, lack of funds to pay for the treatment, or a mental impairment that so affects "judgment, reality testing, or orientation" that the claimant "may not be aware that he or she has a disorder that requires treatment." *Id.* "The problem of drawing negative inferences from a failure to seek or pursue regular treatment is particularly important in cases involving psychological issues because, as previous courts have recognized, 'a person who suffers from psychological and emotional difficulties may lack the rationality to decide whether to continue treatment or medication.'" *Cooper v. Saul*, 444 F. Supp. 3d 565, 580 (S.D.N.Y. 2020) (quoting *Williams v. Colvin*, 2016 WL 4257560, at *3 (W.D.N.Y. Aug. 12, 2016)).

In this case, the ALJ did not draw "negative inferences" from plaintiff's intermittent instances of treatment noncompliance. To the contrary: the ALJ recognized that plaintiff diligently pursued treatment for her mental illness and, for the most part, "follow[ed] treatment once it [was] prescribed," SSR 16-3p(d), 2017 WL 5180304, at *9, including by adhering conscientiously to her medication regimen, which resulted in her condition being "well controlled." (R. 30.) He also recognized that on the rare occasions when plaintiff "stopped taking her medications" (typically in response to psychosocial stressors such as relationship difficulties or job loss), she "demonstrated symptoms of decompensation" including "disheveled dress, crying, explosive anger, slurred speech, and racing and disorganized thoughts." (R. 28.) Because the ALJ did not "weigh[] the

24

claimant's noncompliance against [her] claim for benefits," *White v. Berryhill*, 2018 WL 2926284, at *6, he was not required to probe for the reasons of her rare compliance failures.[10]

Nor did the ALJ otherwise err in his evaluation of plaintiff's subjective symptoms. As against her self-report of severe and persistent symptoms – for example, that she "experiences uncontrolled emotions," "stresses the little things," and "[c]ries all the time" (R. 1130) – the ALJ appropriately cited her treatment notes from St. Mark's, which throughout 2016, 2017, and 2018 (notwithstanding her brief hospitalization in May) reflected consistently normal mental status exams, with little or no evidence of bipolar symptoms, thus providing a longitudinal account of plaintiff's generally stable mental health. (R. 28-29.) Further, plaintiff reported at a number of sessions with Dr. Rybakov that she was working or spoke of her "boss." (R. 1537, 1545, 1551.) She also told Dr. Rybakov that she was "doing well," "taking care of [her] grandson," and (on one occasion) "goi[ng] fishing."(R. 1635, 1641, 1659.) The St. Mark's records are thus consistent with plaintiff's ADLs as reported to the SSA, which include taking her grandson to school every morning, cleaning her house, exercising, fishing (in good weather), walking her dogs, playing video games, and watching TV. (R. 1130-32, 1284.) In the Decision, the ALJ noted, in particular, plaintiff's ability to care for her grandson. (R. 26.) He also relied on Dr. Kamin's opinion that plaintiff had a severe mental impairment but "showed significant improvement in her condition" over the relevant period. (R. 29.)

Because the ALJ appropriately relied on both medical and non-medical evidence to assess the "intensity and persistence" of plaintiff's symptoms, and "identified specific record-based

---

[10] Although not required to do so, the ALJ did ask plaintiff about her May 2018 hospitalization, which was her only instance of medication non-compliance during the period under review. Plaintiff testified that she decompensated because "[m]y mom had passed away and I lost my sister." (R. 1074.)

reasons for his ruling," *Stanton v. Astrue*, 370 F. App'x at 234, his credibility determination is "entitled to deference" in this Court. *Valdez*, 232 F. Supp. 3d at 552 (quoting *Selian*, 708 F.3d at 420).

### C.      Substantial Evidence Supports the ALJ's Decision

Plaintiff's final argument is that the ALJ's conclusions are not supported by substantial evidence, including his determination that plaintiff's mental impairment did not meet the criteria for Listing 12.04, Pl. Mem. at 16, and his formulation of an RFC that (in plaintiff's view) failed to include all of her mental limitations, and consequently prompted deficient testimony by VE Cestar on which the ALJ inappropriately relied. *Id.* at 18-20.[11]

The argument fails. The substantial evidence standard is a "very deferential standard of review," *Brault*, 683 F.3d at 448, permitting the Court to reject the ALJ's findings only if "a reasonable fact-finder *would have to conclude otherwise*." *Id.* (emphasis in original). Moreover, plaintiff's substantial evidence challenge is couched almost entirely in conclusory, boilerplate language. Although plaintiff asserts that "the ALJ mischaracterized the evidence, selectively quoted the record, and misapplied the relevant legal standards," Pl. Mem. at 20, she fails to identify a single example of mischaracterization or selective quotation. Further, as discussed above, the ALJ did not misapply either the treating physician rule or SSR 16-3p.

Nonetheless, I have carefully reviewed the record – including the evidence submitted only after the Decision was issued – and conclude that the ALJ's determination as to Listing 12.04 and his formulation of plaintiff's RFC are supported by substantial evidence. I address each in turn.

---

[11] Plaintiff's attempt to assign error at the final step of the sequential analysis, *see* Pl. Mem. at 18 ("The ALJ erred in improperly relying on the responses of the VE to his incomplete hypothetical") is a makeweight, because it is premised entirely on her underlying contention that the RFC itself was not supported by substantial evidence.

### 1.    Listing 12.04

In determining whether plaintiff's mental impairment met or medically equaled the criteria of Listing 12.04, the ALJ properly considered whether either the "paragraph B" or "paragraph C" criteria were met, and, in reliance on substantial evidence, found that they were not. (R. 25-26.) For the "paragraph B" criteria, he evaluated plaintiff's limitations in the four pertinent domains of mental functioning. With regard to understanding, applying, or remembering information, the ALJ correctly noted that plaintiff's treatment records do not indicate *any* limitations in her memory, cognition, or alertness. Given her limited education, however (and cognizant of her self-report that she had difficulty with concentrating and got "confused fast" (R. 1284)), the ALJ determined that she had a "mild" limitation in this domain. (R. 26.) This determination finds substantial support in the record, including Dr. Kamin's PRT form, which also assessed plaintiff with "mild" limitations in this area (R. 1614), and Dr. Rybakov's October 22, 2016 letter stating that plaintiff's thought process was logical, her perception was within normal limits, her intelligence appeared to be average, and both insight and judgment were within normal limits. (R. 1587.)

With regard to interacting with others, the ALJ found that plaintiff had "moderate" limitations, weighing her ability to maintain long-term relationships against her testimony that crowds make her anxious and that she at times has difficulty controlling her emotions during arguments. (R. 26.) Again, this determination finds substantial support in the record, including plaintiff's varied daily activities and her own assertion that she had no difficulty in getting along with people. (R. 1284.) I note that, as to this domain, the ALJ rejected Dr. Kamin's opinion that plaintiff had only "mild" limitations in interacting with others (R. 1614) and assessed a more significant impairment, which he then factored into his RFC determination by limiting plaintiff to "a job with only occasional close interpersonal contact with supervisors and coworkers [and] no close interpersonal contact with [the] general public." (R. 27.)

With regard to concentrating, persisting, or maintaining pace, the ALJ again found (consistent with Dr. Kamin's opinion) that plaintiff had "moderate" limitations. (R. 26.) As against plaintiff's assertion that she "start[s] things and can't finish them" (R. 1284), the ALJ cited her ability to care for her grandson on a regular basis. (*Id.*) The record furnishes ample additional support for this determination, including plaintiff's regular exercise regimen and daily pet care duties. (R. 1284, 1130-32.)

Finally, with regard to adapting or managing herself, the ALJ found that plaintiff had only "mild" limitations, as evidenced by her ADLs, including, again, taking care of her grandson. (*Id.*) Although Dr. Kamin assessed plaintiff's limitations in this area as "moderate" (R. 1614), the ALJ made his decision on a more complete record, including another year's worth of treating notes from Dr. Rybakov, almost all of which describe plaintiff as "stable" and "under control," or record "no changes" in her mental health. (R. 1621, 1641, 1647, 1659.) I note as well that there is no indication in the St. Mark's records that plaintiff missed therapy appointments or failed to avail herself of psychological help when needed. Even at her worst – when she went off her medications in May 2018 – she arranged for her son to escort her to Bellevue, "on the advice of her therapist," where she voluntarily admitted herself. (R. 169-170.)

Turning to the "paragraph C" criteria, the ALJ noted, correctly, that there was no evidence in the record of "marginal adjustment," that is, that plaintiff had only a "minimal" capacity to adapt to changes in her environment or to demands that are not already part of her daily life. (R. 26.) As to this standard, the ALJ considers whether, for example, the claimant has "become unable to function outside of [her] home or a more restrictive setting, without substantial psychosocial supports." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00G(2)(c). In this case, the record demonstrates that when plaintiff was compliant with her medication regimen – which she usually was – she

28

functioned well both within and without her home: taking care of her grandson, cleaning the house, walking the dogs, fishing, exercising, and walking to (and keeping) appointments (R. 1130-32, 1263), supported by nothing more elaborate than a weekly therapy session and a monthly or bi-monthly medication management appointment with Dr. Rybakov. (R. 420.)

The new evidence that plaintiff submitted to the Appeals Council does not, in my view, materially affect the substantial evidence analysis or (in the words of the Appeals Council) "show a reasonable probability that it would change the outcome of the decision." (R. 2.) Through her counsel, plaintiff submitted more than 700 pages of treating records from Bellevue, many of which relate to her psychiatric admissions in 2008, 2011, and 2015 (*i.e.*, during the period when she was deemed disabled) and are thus irrelevant to the question before the ALJ on the CDR.[12] The records relating to her 2018 admission, as noted above, show that she self-admitted, rapidly improved, and was discharged in four days, at which point she was "med compliant and agreeable to outpatient follow-up." (R. 169-72.)

The new evidence also includes Dr. Rybakov's November 22, 2019 Diagnosis Form, in which, according to plaintiff, he "found" that she met or equaled Listing 12.04. As noted above, such an opinion impermissibly intrudes on a determination "reserved for the Commissioner," *Torres*, 2014 WL 4467805, at *7, and therefore would not trigger the treating physician rule. A medical expert is permitted to opine on the severity of a claimant's limitations in the four functional areas, but Dr. Rybakov's ratings ("moderate," "marked," "marked," and "marked") are rendered on a check-the-box form and are entirely conclusory. (R. 421-22.) He provides no narrative, no supporting detail, no analysis of any of the actual functional abilities that roll up into each of the

---

[12] The Bellevue documents also include earlier records – dating back to 2006 – reflecting transient medical issues wholly unrelated to her later claim for benefits.

four broad areas,[13] and no documentation – other than his most recent treating note, dated November 2, 2019, which (if anything) undermines his opinion, because, like his other treating notes from 2016 forward, it shows that plaintiff's mood was "stable," she had "no issues to report," she was not using drugs, and was "getting along with people." (R. 423-24.) Moreover, Dr. Rybakov's statements that plaintiff "relies on weekly individual psychotherapy & medication, both of which are ongoing & diminish symptoms/signs of patient's mental disorder," and "has history of psychiatric hospitalizations & rapid decompensation due to noncompliance with medications" (R. 422), furnish no new information that could cast doubt on the ALJ's factual findings. Thus, after reviewing the entire administrative record, I conclude that the ALJ's determination that plaintiff's bipolar disorder did not meet or equal Listing 12.04 is supported by substantial evidence and may not be disturbed by this Court.

 2. **RFC**

I reach the same conclusion as to the ALJ's RFC determination, which is an "administrative" function that is the sole province of the ALJ. *Curry*, 855 Fed. App'x at 48 n.3. It is apparent from the Decision that the ALJ properly considered all of plaintiff's medically determinable impairments, including her non-exertional impairments. He clearly acknowledged that plaintiff has a serious mental illness, and accommodated it accordingly, limiting her to "unskilled repetitive, rote work" that did not involve the stress of "assembly line production quotas." (R. 27.) Further, in order to accommodate her anxiety, as well as her moderate limitations

---

[13] For example, the second category – ability to interact with others – "refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00E(2).

in interacting with others, the ALJ limited plaintiff to jobs involving "only occasional close interpersonal contact with supervisors and co-workers and "no close interpersonal contact with the general public." (*Id.*)

"[I]t is the ALJ's prerogative to make an RFC assessment after weighing the evidence and the District Court may not reverse provided there is substantial evidence in the record to support her findings." *Moronta v. Comm'r of Soc. Sec.*, 2019 WL 4805801, at *19 (S.D.N.Y. Sept. 30, 2019) (quoting *Mitchell v. Astrue*, 2010 WL 3070094, at *5 (W.D.N.Y. Aug. 4, 2010)). In this case, after reviewing the entire administrative record, I conclude that the ALJ's RFC formulation is supported by substantial evidence and may not be disturbed by this Court. This also disposes of plaintiff's contention, Pl. Mem. at 18, that the ALJ "erred in posing a hypothetical to the vocational expert that relied on an inaccurate RFC."

To be sure, there is some evidence in the record that would support the conclusion that plaintiff had greater limitations than those the ALJ incorporated into his RFC determination. But that is not the test. "If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." *Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008). Having found that the ALJ's decision was supported by substantial evidence, I am required, under the "very deferential standard of review" that applies to ALJ fact-finding, to accept the Commissioner's RFC determination, *see Brault*, 683 F.3d at 448; *see also Blalock v. Berryhill*, 2018 WL 6332896, at *14 (S.D.N.Y. Nov. 8, 2018) ("The existence of contrary evidence does not negate substantial evidence supporting the ALJ's decision."), and, hence, his determination of non-disability.

V.    CONCLUSION

Because the Decision is free from legal error and the ALJ's findings and conclusions are

supported by substantial evidence in the record, plaintiff's motion (Dkt. No. 23) is DENIED, the

Commissioner's motion (Dkt. No. 25) is GRANTED, and this action is dismissed.

Because this Amended Opinion and Order amends the Opinion and Order at Dkt. No. 30,

the Clerk of Court is respectfully directed to strike the entry at Dkt. No. 30.

Dated:  New York, New York          **SO ORDERED.**
        April 1, 2022

_____

**BARBARA MOSES**
**United States Magistrate Judge**